## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

In re: ENERGY FUTURE HOLDINGS
CORP., et al.,

Debtors.

DELAWARE TRUST COMPANY,
as TCEH First Lien Indenture Trustee,

Appellant,

v.

WILMINGTON TRUST, N.A., as First
Lien Collateral Agent and First Lien
Administrative Agent, et al.,

Appellees.

and

MORGAN STANLEY CAPITAL GROUP
INC., J. ARON & COMPANY, and TITAN
INVESTMENT HOLDINGS LP,

Appellees.

Chapter 11
Bankruptcy Case No. 14-10979-CSS
(Jointly Administered)

Bankruptcy Adv. No. 15-51239-CSS

Civil Action Nos. 16-189-RGA & 17-540-RGA

## MEMORANDUM OPINION

Neil B. Glassman, GianClaudio Finizio, BAYARD, P.A., Wilmington, DE; Michael S. Kim
(argued), Jeremy C. Hollembeak, Benjamin J.A. Sauter, Melanie L. Oxhorn, Andrew D. Wang,
KOBRE & KIM LLP, New York, NY; Tina N. Moss, PERKINS COIE LLP, New York, NY.

Attorneys for Appellant.

Ashley R. Altschuler, R. Craig Martin, DLA PIPER LLP (US), Wilmington, DE; Howard R.
Hawkins, Jr., Ellen M. Halstead, Michele Maman, Thomas J. Curtin, CADWALADER,
WICKERSHAM & TAFT LLP, New York, NY; Mark C. Ellenberg (argued), CADWALADER,
WICKERSHAM & TAFT LLP, Washington, DC; Mark Felger, Barry M. Klayman, Simon E.
Fraser, COZEN O'CONNOR, Wilmington, DE; Thomas J. Moloney (argued), Sean A. O'Neal,
Humayun Khalid, CLEARY GOTTLIEB STEEN & HAMILTON LLP, New York, NY; Elsbeth

Bennett, CLEARY GOTTLIEB STEEN & HAMILTON LLP, Washington, DC; Bradley R. Aronstam, Benjamin J. Schladweiler, ROSS ARONSTAM & MORITZ LLP, Wilmington, DE; Salvatore A. Romanello, Ronit J. Berkovich, Jessica Liou, WEIL, GOTSHAL & MANGES LLP, New York, NY; Michael D. Debaecke, BLANK ROME LLP, Wilmington, DE; Mark D. Kotwick, SEWARD & KISSEL LLP, New York, NY; Joseph H. Huston, Jr., STEVENS & LEE, Wilmington, DE; Peter M. Friedman, O'MELVENY & MYERS, Washington, DC.

Attorneys for Defendants.

March 2*7*, 2018


**ANDREWS, U.S. DISTRICT JUDGE:**

This is an appeal from the Bankruptcy Court's April 27, 2017 Order denying Appellant's

Motion to Partially Vacate the Allocation Order pursuant to Federal Rule of Bankruptcy

Procedure 9024 and Federal Rule of Civil Procedure 60(b). The appeal is fully briefed. (D.I. 29;

D.I. 38; D.I. 40).[1] I held oral argument on November 7, 2017. (D.I. 45 ("Tr.")). For the reasons

set forth below, the Order is **AFFIRMED**.

## I. BACKGROUND

On April 29, 2014, Texas Competitive Electric Holdings ("TCEH"), its parent Energy

Future Holding Competitive Holdings Company (collectively, with TCEH and its debtor

subsidiaries, the "TCEH Debtors"), and certain affiliates (collectively, the "Debtors") "filed

voluntary petitions under chapter 11 of title 11 of the United States Code" in the United States

Bankruptcy Court for the District of Delaware. (D.I. 32-11 ("Orig. Op.") at A1132).[2] As of that

date, the Debtors represented that they had approximately $25.6 billion of first lien debt. (Orig.

Op. at A1137-38). Their debt was secured by liens on collateral granted pursuant to two

agreements: (i) the Security Agreement, dated as of October 10, 2007, as amended and restated

as of August 7, 2009, and (ii) the Pledge Agreement, dated as of October 10, 2007, as amended

and restated as of August 7, 2009. (*Id.* at A1138). The debt, collectively known as the "First

Lien Claims," was held by the "First Lien Creditors." (*Id.*).

"The relationship among the First Lien Creditors with respect to their shared collateral is

governed by the Collateral Agent and Intercreditor Agreement," executed in 2007 and amended

in 2009 (the "Intercreditor Agreement"). (Orig. Op. at A1139).

Section 2.1 of the Intercreditor Agreement provides that the property rights held by each

---

[1] All docket citations, unless otherwise indicated, are to the docket in No. 17-540.

[2] *In re Energy Future Holdings Corp.*, 546 B.R. 566 (Bankr. D. Del. 2016).

3

First Lien Creditor in the First Lien Collateral and its proceeds is *pari passu*[3] as among the First

Lien Creditors "except as otherwise provided in Section 4.1" (Orig. Op. at A1139). Section 4.1

provides:

4.1 <u>Application of Proceeds</u>. Regardless of any Insolvency or Liquidation
Proceeding which has been commenced by or against the Borrower or any other
Loan Party, *Collateral or any proceeds thereof received in connection with the
sale or other disposition of, or collection on, such Collateral upon the exercise of
remedies under the Security Documents by the Collateral Agent* shall be applied
in the following order (it being agreed that the Collateral Agent shall apply such
amounts in the following order as promptly as is reasonably practicable after the
receipt thereof; <u>provided</u> that such amounts shall not be so applied until such time
as the amount of the Secured Obligations has been determined in accordance with
the terms hereof and under the terms of the relevant Financing Document,
including and subject to <u>Sections 4.3</u> and <u>4.4</u> below)

(a) with respect to all Collateral other than Deposit L/C Collateral:

<u>first</u>, on a <u>pro rata</u> basis, to the payment of all amounts due to the
Collateral Agent, any Agent, and the Issuing Lenders (in such capacities)
(other than amounts constituting Interest Expenses) under any of the
Financing Documents, excluding in the case of the Issuing Lenders,
amounts payable in connection with any unreimbursed amount under any
Letter of Credit;

<u>second</u>, on a <u>pro rata</u> basis to any Secured Party which has theretofore
advanced or paid any fees to any Agent or Issuing Lender, other than any
amounts covered by priority first, an amount equal to the amount thereof
so advanced or paid by such Secured Party and for which such Secured
Party has not been previously reimbursed;

<u>third</u>, on a <u>pro rata</u> basis, to the payment of, without duplication, (a) all
principal and other amounts then due and payable in respect of the
Secured Obligations (including Cash Collateralization of all outstanding
Revolving Letters of Credit as required under the Credit Agreement or any
other applicable Financing Document) and (b) the payment of Permitted
Secured Hedge Amounts then due and payable to any Secured Commodity
Hedge Counterparty under any Secured Commodity Hedge and Power
Sales Agreement; and

---

[3] *Pari passu* means "proportionally; at an equal pace; without preference." *Pari passu, Black's Law
Dictionary* (10th ed. 2014).

4

> last, the balance, if any, after all of the Secured Obligations have been indefeasibly paid in full in cash, to the Loan Parties or as otherwise required by applicable law.

(b) with respect to Deposit L/C Collateral:

> first, on a pro rata basis, to the payment of all amounts due to the Deposit Letter of Credit Issuer under any of the Financing Documents, excluding amounts payable in connection with any unreimbursed amount under any Letter of Credit;
>
> second, on a pro rata basis, to the payment of all amounts due to the Deposit Letter of Credit Issuer in an amount equal to 100% of the Unpaid Drawings under any Deposit Letter of Credit;
>
> third, on a pro rata basis, to any Secured Party which has theretofore advanced or paid any fees to the Deposit Letter of Credit Issuer, other than any amounts covered by priority second, an amount equal to the amount thereof so advanced or paid by such Secured Party and for which such Secured Party has not been previously reimbursed;
>
> fourth, on a pro rata basis, to the payment of all other Deposit L/C Obligations; and
>
> last, the balance, if any, after all of the Deposit L/C Obligations have been indefeasibly paid in full in cash, as set forth above in Section 4.1(a).

(D.I. 30-1, at A23-24) (Intercreditor Agreement § 4.1) (emphasis added). Section 4.1 thus

contains a "waterfall," which is a set of rules governing the distribution of the Secured Parties'

collateral or collateral proceeds ("Section 4.1 Waterfall").

On June 6, 2014, the Bankruptcy Court entered a Cash Collateral Order granting

Adequate Protection Payments to the First Lien Creditors "to the extent of any diminution in

value of their interests in Collateral." (D.I. 30-2 at A61-119; D.I. 34-6 ("New Op.") at 2186).[4]

Then, on September 21, 2015, the Debtors filed their Fifth Amended Joint Plan of

Reorganization (the "Original Plan"). (*See* D.I. 30-5 at A308). The Original Plan was confirmed

in December 2015. (New Op. at A2179).

---

[4] *In re Energy Future Holdings Corp.*, 566 B.R. 669 (Bankr. D. Del. 2017).

Appellant commenced an adversary proceeding in the Bankruptcy Court. There were three "different types of TCEH First Lien Creditors in [the] adversary proceeding[,] each with a different interest rate." (Orig. Op. at A1131). The First Lien Creditors were undersecured. (*Id.*). As a result, the First Lien Creditors disagreed as to how distributions should be made under any chapter 11 plan involving the TCEH Debtors.

In the adversary proceeding, Appellant sought, among other relief, a declaration that Section 4.1 of the Intercreditor Agreement "governs the allocation among TCEH First Lien Creditors of distributions to be made under any confirmed and consummated chapter 11 plan involving the TCEH Debtors," including the Original Plan. Appellant also sought a declaration that, if applied, Section 4.1 "requires such distributions to be allocated based on the relative amounts owing to the TCEH First Lien Creditors on the date of distribution, including accrued but unpaid post-petition interest, regardless of whether such interest was allowed or allowable in the Chapter 11 Cases." (New Op. at A2179). Appellant's requests were part of the parties' cross-motions for judgment on the pleadings. (Orig. Op. at A1134-35; D.I. 29 at 8; D.I. 38 at 10).

On March 22, 2016, the Bankruptcy Court ruled in its Allocation Order and accompanying Opinion that "Section 4.1 [does] not govern allocation of distributions, if any, when made upon the subsequent consummation" of the Original Plan. (New Op. at A2179).

The Original Plan failed to obtain certain required regulatory approvals, so the Debtors withdrew the Original Plan on April 30, 2016. (D.I. 38 at 8; New Op. at A2179). On May 1, 2016, the Debtors filed a new plan of reorganization (the "New Plan"). (D.I. 34-3 at A2042-166).

The New Plan provided for several distributions to the First Lien Creditors, pursuant to

6

an internal Spin-Off transaction. Under the New Plan, as part of the internal Spin-Off transaction, the Debtor, TCEH, transferred its interests in its subsidiaries to a newly formed subsidiary, Reorganized TCEH, now known as Vistra Energy. (New Op. at A2192). In exchange, TCEH received (a) 100% of the membership interests in Reorganized TCEH, which became common stock upon Reorganized TCEH's conversion into a corporation, and (b) the net cash proceeds of Reorganized TCEH's newly issued debt. (New Op. at A2192-93; D.I. 38 at 9). A Spin-Off Preferred Stock Sale then occurred, in which Reorganized TCEH transferred assets to a new subsidiary, Preferred Stock Entity, in exchange for Preferred Stock Entity's common stock and a class of preferred stock. (New Op. at A2192-93; D.I. 34-3 at A2078). Reorganized TCEH sold the preferred stock to third party investors, which allowed it to obtain a step-up in basis tax benefit. (New Op. at A2199).

Appellant filed a motion to partially vacate the Allocation Order pursuant to Federal Rule of Bankruptcy Procedure 9024 and Federal Rule of Civil Procedure 60(b), because the Allocation Order was premised on the failed Original Plan. (New Op. at A2180). After examining the changes between the Original Plan and the New Plan, the Bankruptcy Court decided that the "relevant changes between the First Plan and the New Plan are minimal at best." (New Op. at A2194, A2199). Thus, the Bankruptcy Court denied Appellant's motion to partially vacate judgment, adopted its Allocation Opinion, and decided that Section 4.1 does not govern the allocation of distributions, if any, made under the New Plan. (New Op. at A2199, A2212-13). The Bankruptcy Court entered a new Allocation Order adopting its original Allocation Order. (D.I. 9 at 6).

Appellant previously appealed the Bankruptcy Court's original Allocation Order. That appeal is located at Docket No. 16-189. The parties filed a joint motion for entry of an order

consolidating the original appeal (No. 16-189) with the present appeal of the Bankruptcy Court's new Allocation Order (No. 17-540). (D.I. 9). I granted that motion on June 7, 2017. (D.I. 14). Accordingly, the original appeal (No. 16-189) is dismissed as moot.

## II.     LEGAL STANDARDS

### A. Standard of Review

The Court has jurisdiction to hear an appeal from a final judgment of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1). On appeal from an order issued by the Bankruptcy Court, the Court "review[s] the bankruptcy court's legal determinations *de novo*, its factual findings for clear error and its exercise of discretion for abuse thereof." *In re Trans World Airlines, Inc.*, 145 F.3d 124, 131 (3d Cir. 1998). Abuse of discretion is found where a "court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Mack Trucks, Inc.*, 820 F.2d 91, 95 (3d Cir. 1987). Since the matter being reviewed here involves the Bankruptcy Court's conclusions about the construction of a contractual provision and its application to a plan of reorganization and a cash collateral order, review is *de novo*.

### B. Motion for Judgment on the Pleadings

The standard for a Rule 12(c) motion for judgment on the pleadings is the same as the standard for a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. *See Children's Seashore House v. Waldman,* 197 F.3d 654, 657 n. 1 (3d Cir. 1999); *Turbe v. Gov't of the Virgin Islands,* 938 F.2d 427, 428 (3d Cir. 1991).

Rule 8 requires a complainant to provide "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) allows the accused party to bring a motion to dismiss the claim for failing to meet this standard. A Rule

8

12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

"Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555). I am "not required to credit bald assertions or legal conclusions improperly alleged in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). A complaint may not be dismissed, however, "for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014).

A complainant must plead facts sufficient to show that a claim has "substantive plausibility." *Id.* at 347. That plausibility must be found on the face of the complaint. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the [complainant] pleads factual content that allows the court to draw the reasonable inference that the [defendant] is liable for the misconduct alleged." *Id.* Deciding whether a claim is plausible will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). "However, an exception to the general rule is that a 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *Id.* (emphasis removed).

9

## C. Contract Interpretation

This case is subject to New York's law of contracts. (*See* Intercreditor Agreement §
9.10, D.I. 36-2 at A3372; D.I. 36-3 at A3415). "Under New York law, the initial interpretation
of a contract is a matter of law for the court to decide. Where the agreement is unambiguous, a
court may not admit extrinsic evidence and interprets the plain language of the agreement as a
matter of law." *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 328 (S.D.N.Y. 2010).
"On a motion to dismiss, the Court may resolve issues of contract interpretation when the
contract is properly before the Court, but must resolve all ambiguities in the contract in
Plaintiffs' favor." *Id.* "However, 'when the language of a contract is ambiguous, its construction
presents a question of fact,' which of course precludes summary dismissal." *Bank of Am. Corp.
v. Lemgruber*, 385 F. Supp. 2d 200, 226 (S.D.N.Y. 2005).

"[T]he mere fact that the Parties disagree on the proper interpretation of the contract does
not render the contractual language ambiguous." *Serdarevic*, 760 F. Supp. 2d at 329. "Contract
language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of
misconception in the purport of the [contract] itself, and concerning which there is no reasonable
basis for a difference of opinion.'" *Id.* "[A] term is ambiguous when it is capable of more than
one meaning when viewed objectively by a reasonably intelligent person who has examined the
context of the entire integrated agreement and who is cognizant of the customs, practices, usages
and terminology as generally understood in the particular trade or business." *Prior v. Innovative
Commc'ns Corp.*, 207 F. App'x 158, 163 (3d Cir. 2006) (interpreting New York law). "A
contract's ambiguity is a matter of law that we review *de novo*." *Id.*

"Under New York law, written agreements are construed in accordance with the parties'
intent and '[t]he best evidence of what parties to a written agreement intend is what they say in
their writing.'" *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013). "Words

10

and phrases used in an agreement must be given their plain meaning . . . ." *Bianco v. Bianco*, 36 A.D.3d 490, 491 (N.Y. App. Div. 2007). "The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect." *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956). "Even if there was an inconsistency between a specific provision and a general provision of a contract . . . , the specific provision controls." *Id.*

## III. DISCUSSION

This appeal concerns how certain of the Debtors' assets should be allocated among a group of secured creditors called the First Lien Creditors. Pre-bankruptcy, the First Lien Creditors collectively lent over $25 billion to the Debtors. After bankruptcy, the Debtors were unable to repay the First Lien Creditors in full. As a result, the First Lien Creditors received distributions worth only about 41% of the allowed amount of their secured claims. (D.I. 35-1 at A2415). Appellant, acting as Indenture Trustee for one group of secured creditors, disagrees with Appellees, a group that includes other secured creditors, as to how these distributions should have been made.

There are two disputes here. First, the parties dispute whether the distributions must be allocated to the First Lien Creditors using the Section 4.1 Waterfall. Second, if the Section 4.1 Waterfall applies, the parties dispute whether post-petition interest should accrue on the First Lien Claims "for purposes of allocating payments between and among" the First Lien Creditors, or whether payments "should be allocated on a *pro rata* basis based on the amounts owed as of" the petition date. (Orig. Op. at A1131).

The parties estimate that $90 million hinges on the answers to these questions. (Orig. Op. at A1132).

11

As a caveat, this opinion addresses the parties' most salient arguments. The parties make various other arguments and refer to other provisions in the various agreements, none of which materially alters the outcome of my decision.

## A. Conditions Precedent

The Bankruptcy Court determined that there are four conditions precedent to the application of the Section 4.1 Waterfall:

(i) Collateral or any proceeds of Collateral are to be distributed to the First Lien Creditors;

(ii) the Collateral must be "received" by the Collateral Agent;

(iii) the Collateral or the proceeds of Collateral must have resulted from a sale or other disposition of, or collection on, such Collateral; and

(iv) the sale, disposition, or collection must have resulted from the exercise of remedies under the Security Documents.

(Orig. Op. at A1152; New Op. at A2191-92). The Bankruptcy Court further determined that if any of these conditions precedent are not met, then the distributions to the First Lien Creditors, pursuant to the New Plan, "would be distributed outside of the Intercreditor Agreement (i.e.[,] pursuant to the terms of the Bankruptcy Code, orders of this Court, and the Plan)." (Orig. Op. at A1152). The Bankruptcy Court found the Section 4.1 Waterfall inapplicable to the case at hand because none of the four conditions precedent were met. (New Op. at A2199-209).

Appellant argues that the preamble should not be given effect, and that the second, third, and fourth conditions precedent need not be examined. Specifically, Appellant asserts that Section 4.1 is the only contractual provision that provides how creditors share Collateral and proceeds, and no part of the contracts contemplates any other method of distributing Collateral and proceeds. (D.I. 29 at 4, 10, 24-27; D.I. 40 at 8-10). As a result, argues Appellant, the preamble should be disregarded, and the Section 4.1 Waterfall should serve as the sole method of distributing Collateral and proceeds.

12

The Bankruptcy Court correctly gave effect to the preamble language. "Contracts are . . . to be interpreted . . . to give meaning to all [their] terms." *In re Energy Future Holdings Corp.*, 842 F.3d 247, 256 (3d Cir. 2016) (quoting *Barrow v. Lawrence United Corp.*, 146 A.D.2d 15, 18 (N.Y. App. Div. 1989)). Section 4.1 of the Intercreditor Agreement provides that "Collateral or any proceeds thereof received in connection with the sale or other disposition of, or collection on, such Collateral upon the exercise of remedies under the Security Documents by the Collateral Agent shall be applied in the following order . . . ." (Intercreditor Agreement § 4.1). If the parties intended the Section 4.1 Waterfall to serve as the only method of distributing Collateral and proceeds, they would not have inserted this detailed language, which specifies that only "Collateral or proceeds thereof" meeting certain conditions "shall be applied" using the Waterfall. Rather, the parties would have used broader language in the preamble such that the Section 4.1 Waterfall would indisputably serve as the method of distributing Collateral and proceeds in every instance. Because the parties used this preamble language, I must give it meaning. Accordingly, I interpret the preamble language as providing conditions precedent to the application of the Section 4.1 Waterfall.

This conclusion comports with Appellees' argument that the Collateral Agent has a "very precise role," triggered only by "an agreement default" and "direction from the requisite number of creditors." (Tr. 33:13-17).

Furthermore, in the Bankruptcy Court, Appellant itself agreed that the preamble contains certain conditions precedent to the application of Section 4.1. (D.I. 32-10 at A1093). Appellant is bound to its agreement. *See, e.g., Eid v. Thompson*, 740 F.3d 118, 125 (3d Cir. 2014) ("It is axiomatic that arguments asserted for the first time on appeal are deemed to be waived and consequently are not susceptible to review in this Court absent exceptional circumstances.").

## B. "Collateral or any proceeds of Collateral are to be distributed to the First Lien Creditors"

Among the conditions precedent to the application of the Section 4.1 Waterfall is that "Collateral or any proceeds of Collateral [must] be distributed to the First Lien Creditors."

The Plan provided for the following distributions to the First Lien Creditors, pursuant to the internal Spin-Off: (i) "100% of [Reorganized TCEH's] common stock" ("Stock Distribution"); (ii) "all remaining cash on TCEH's balance sheet, as well as all of the cash it had received from [Reorganized TCEH]," each subject to certain limitations ("Cash Distribution"); and (iii) contract rights to receive payments "pursuant to a tax receivable agreement entered into by Reorganized TCEH" ("TRA Rights") (collectively, the "Plan Distributions"). (D.I. 29 at 12; D.I. 38 at 9; D.I. 34-3 at A2107, A2114-15).

The parties agree that these distributions were made, but disagree as to whether each constitutes "Collateral" or "proceeds of Collateral." The parties also dispute whether the Adequate Protection Payments distributed per the Cash Collateral Order constitute "Collateral" or "proceeds of Collateral." (Orig. Op. at A1132, A1143).

### 1. Stock Distribution

The Stock Distribution is not "Collateral." Reorganized TCEH's stock by definition cannot be "Collateral," because it was issued as part of a Chapter 11 plan. The New Plan provides that all former liens are released, and all property "vest[s] in each applicable Reorganized Debtor[] free and clear of all Liens." (D.I. 34-3 at A2122; D.I. 38 at 18-19). Thus, these new shares did not exist before bankruptcy, and the Collateral Agent's lien never attached to them. (Tr. 86:7-9). Because these shares cannot be "Collateral," Appellant is left to argue that the shares are "proceeds of Collateral."

14

Several relevant contracts define "proceeds." The Security Agreement defines "Proceeds" as "consideration received from the *sale, exchange*, license, lease or other *disposition* of any asset or property that constitutes *Collateral.*" (D.I. 36-2 at A3354) (emphasis added). The Pledge Agreement provides a similar definition: amounts "receivable or received when Collateral or Proceeds are *sold, exchanged*, collected or otherwise *disposed* of." (D.I. 36-3 at A3403) (emphasis added).

Appellant contends that the Stock Distribution constitutes "proceeds," because the internal Spin-Off amounted to a "sale," "exchange," or "disposition" of Collateral. (D.I. 29 at 13). Appellant notes that as part of the Spin-Off, TCEH transferred its Collateral "to [Reorganized TCEH] in exchange for" consideration that included the Stock Distribution. (*Id.*). Thus, argues Appellant, the Stock Distribution is "proceeds" of that Collateral, which was transferred via "sale" or "disposition." (*Id.*).

Appellees, on the other hand, aver that no "sale" or "disposition" occurred, and the Stock Distribution thus does not constitute "proceeds." To support their argument, Appellees analogize the case-at-hand to the facts in *In re MPM Silicones, LLC*, 518 B.R. 740 (Bankr. S.D.N.Y. 2014) (hereinafter "*Momentive*"). (D.I. 38 at 17). *Momentive* is not binding authority. (Tr. 45:2-4). Nevertheless, Appellees urge that *Momentive* is helpful, and that the internal Spin-Off is akin to the debt-for-equity swap in *Momentive*, where Judge Drain found stock distributions to not be "proceeds," because no "sale" or "disposition" occurred. *Momentive*, 518 B.R. at 754-56.

In *Momentive*, like here, the debtor was reorganized. Under the plan, there was a debt-for-equity swap whereby the common stock of the newly reorganized debtor was distributed to "second lien" creditors, who did not retain their liens. 518 B.R. at 754-55. Other lienholders, called the first and 1.5 lien creditors, did retain their liens. *Id.* In analyzing whether the

15

distributions to the second lien creditors constituted "proceeds," the court opined that "[v]ery clearly . . . a secured creditor is not getting the proceeds of its collateral when it gets stock in the reorganized entity, unless, of course, that stock was paid by a third-party buyer in return for the debtor's assets comprising the collateral." *Id.* at 756. Ultimately, the court found that no third-party buyer took ownership of the collateral, and "the property constituting the Common Collateral has stayed the same." *Id.* at 755-56. Thus, the court found that the distributions to the former second lien creditors were not proceeds "for purposes of the New York [Uniform Commercial Code] section 9-102(a)(64), or, for that matter, any other definition of collateral proceeds." *Id.* at 754.

Appellant seeks to distinguish *Momentive* in two principal ways. First, Appellant argues that unlike *Momentive*, ownership of the Collateral changed here, meaning a "sale" or "disposition" took place. (D.I. 29 at 11-12; D.I. 40 at 11-12). Second, Appellant argues that even if ownership of the Collateral did not change, "the Spin-Off exhausted the economic value of the Collateral completely," and the Distributions are necessarily "substitutes" for the Collateral that constitute "proceeds." (D.I. 40 at 12-13).

### a. Sale or Disposition

Like in *Momentive*, there was no sale. Rather, the internal Spin-Off was akin to a standard debt-for-equity reorganization. The First Lien Creditors received a stock distribution from Reorganized TCEH in exchange for release of their liens on the Collateral.

A "sale" is defined in Black's Law Dictionary as the "transfer of property or title for a price." *Sale, Black's Law Dictionary* (10th ed. 2014). TCEH transferred its interests to Reorganized TCEH in exchange for membership interests in TCEH and the net cash proceeds of Reorganized TCEH's newly issued debt. No sale for a price occurred. Reorganized TCEH was not a third-party buyer.

16

"After the Preferred Stock Sale," in which Reorganized TCEH transferred a part of the Collateral to the Preferred Stock Entity, "the Preferred Stock Entity continued to be a member of the TCEH consolidated group for income tax reporting purposes." (New Op. at A2202). TCEH, and later its successor Reorganized TCEH, "remained the holder of 100% of the common stock of the Preferred Stock Entity at all relevant times – so there was no sale of assets to a third party, nor were there any proceeds of Collateral generated from such transaction." (*Id.*).

The internal Spin-Off amounted to the internal transfer of interests from TCEH to its successor, Reorganized TCEH. As the Bankruptcy Court noted, the New Plan structure was implemented "solely for taxes purposes[,] and without bidding procedures, an auction, and typical Section 363 sale attributes." (New Op. at A2202-03).

Thus, I agree with the Bankruptcy Court that no sale occurred, and that this reorganization was akin to the debt-for-equity swap in *Momentive*. (New Op. at A2205).

Appellant makes several arguments that the internal Spin-Off constituted a sale. None of these arguments are availing.

First, Appellant argues that the reorganization's classification as a "G" reorganization pursuant to Section 368(a)(1)(G) of the Internal Revenue Code indicates that a sale occurred. (D.I. 29 at 13-14). However, a "G" reorganization requires only the transfer of assets to another corporation in exchange for consideration. 11-TX10 *Collier on Bankruptcy*, P TX10.01[2] (16th ed. 2017). It does not bear on the transaction's characterization or necessarily indicate that a "sale" occurred.

Second, Appellant notes that Reorganized TCEH achieved a step-up in the tax basis of a portion of the Collateral by the exchange of TCEH First Lien Collateral from Reorganized TCEH to the Preferred Stock Entity during the Preferred Stock Sale. (D.I. 29 at 14-15; New Op.

at A2199). This transfer amounts to a break in "control" for purposes of section 351 of the Internal Revenue Code. (D.I. 35-1 at A2582). However, Reorganized TCEH's tax basis in the Collateral does not impact my conclusion that no sale occurred. *See In re Lyondell Chem. Co.*, 503 B.R. 348, 379-80 (Bankr. S.D.N.Y. 2014) (recognizing that transactions are "examined for their substance, not their form"). By issuing a new class of *de minimis* value contingent-voting stock, Reorganized TCEH "broke control" for tax purposes while still retaining actual control of the Preferred Stock Entity. (New Op. at A2201; D.I. 38 at 25). As the Bankruptcy Court noted, "the economic reality is that TCEH (and eventually its successor, Reorganized TCEH) remained the holder of 100% of the common stock of the Preferred Stock Entity at all relevant times." (New Op. at A2202).

Third, Appellant argues that the internal Spin-Off "could not have been accomplished without the Separation Agreement" (D.I. 33-6), which "details the specific agreements regarding which TCEH assets would be acquired or left behind, and which TCEH liabilities would be assumed or excluded." (D.I. 29 at 15). The Separation Agreement, however, only demonstrates the undisputed fact that Reorganized TCEH retained TCEH's assets. It is consistent with a conclusion that a transfer of assets does not necessarily equate to a sale. (D.I. 33-6 at A1792).

Fourth, and finally, Appellant argues that before the internal Spin-Off, "the Collateral included [Energy Future Competitive Holdings Company's] 100% ownership of TCEH stock," making Energy Future Competitive Holdings Company "the ultimate owner of the Collateral," which included TCEH itself. (D.I. 40 at 11). *Momentive* is different, says Appellant, because that shared Collateral "did not include stock ownership in the parent debtor corporation." (D.I. 40 at 12; 518 B.R. at 754). Indeed, the Collateral here was owned by the parent debtor Energy Future Competitive Holdings Company pre-reorganization, and by the former first lien creditors

18

post-reorganization. In *Momentive*, the collateral was owned by MPM's equity investors pre-reorganization, and by the former second lien creditors post-reorganization. 518 B.R. at 754-55. This difference is not meaningful. It is of no significance that debtor TCEH had a parent company which was the ultimate owner of the Collateral pre-reorganization. The situation here and the situation in *Momentive* are substantively similar in that they both involve a debt-for-equity reorganization where the reorganized entity in reality retains actual control of the collateral. The parties agree that no sale or disposition of the Common Collateral occurred in *Momentive*. (D.I. 38 at 17; Tr. 21:17-21). The outcome should be no different here. Accordingly, Appellant's effort to distinguish this case from *Momentive* is unavailing.

Likewise, there was no "disposition." As a threshold matter, the parties agree that a "disposition" is broader than a "sale." (D.I. 29 at 30; Tr. 48:5-9). In their brief, Appellees argued that a "disposition" is narrower than a "sale," and means "transfers to unrelated third parties." (D.I. 38 at 23). At oral argument, however, Appellees agreed that "disposition" is broader than "sale." (Tr. 48:5-9).

The parties dispute just how much broader a disposition actually is.

Appellees argue that a "sale," like a "foreclosure" or "gift," is one kind of disposition. (Tr. 48:5-49:6, 54:12-16). As discussed above, no "sale" occurred. Similarly, no "foreclosure," "gift," or other type of "disposition" identified by Appellees occurred.

Appellant, on the other hand, argues that a "disposition" covers a broader array of transactions than the discrete categories identified by Appellees. (Tr. 80:6-19). However, Appellant does not offer a workable or defined boundary for a "disposition." Black's Law Dictionary defines a "disposition" as the "act of transferring something to another's care or possession . . . the relinquishing of property." *Disposition*, *Black's Law Dictionary* (10th ed.

19

2014). Even under this broad definition, no "disposition" occurred. The Collateral was not transferred to "another's care or possession." Rather, it was internally transferred to a reorganized version of TCEH. *See infra* III.B.1.a. For the same reason, no "exchange" occurred.

Thus, having examined the transaction as a whole, I agree with the Bankruptcy Court's conclusion that no "sale" or other "disposition" of Collateral occurred under the New Plan. (*See* New Op. at A2203).

### b. Exhaustion of Collateral

Appellant argues that *Momentive* further differs from the case at hand given that some lienholders retained their liens post-reorganization in that case, but no lienholders retained their liens in this case. (D.I. 40 at 12-13). By definition, Collateral requires a lien to exist. New York U.C.C. § 9-102(a)(12) ("Collateral means the property subject to a security interest"). In *Momentive*, the First and 1.5 Lien Creditors retained their liens. 518 B.R. at 754-55. Here, on the other hand, no one retained their liens, because the internal Spin-Off resulted in the "cancellation of the Collateral Agent's Liens in their entirety." (D.I. 40 at 12). Thus, argues Appellant, the Spin-Off exhausted the economic value of the Collateral entirely, and the Distributions are necessarily substitutes for, or proceeds of, the Collateral. (*Id.*; *see* R. Wilson Freyermouth, *Rethinking Proceeds: The History, Misinterpretation and Revision of U.C.C. Section 9-306*, 69 Tul. L. Rev. 645, 667 (1995)) ("To give the term 'proceeds' a coherent, functional meaning, one must define that term to include all assets received upon the occurrence of events that *exhaust* the collateral's economic value or productive capacity") (emphasis added)).

Appellees argue that "[a]ll of the Collateral continues to exist and be owned by Reorganized TCEH, the successor to TCEH," post-reorganization. (D.I. 38 at 16).

In response, Appellant asserts that Appellees improperly conflate the continued existence of the Collateral with the continued existence of the assets that made up the Collateral. (D.I. 40 at 13). Appellant argues that looking to the value of the assets themselves "makes no sense, as the same conclusion [that the Spin-Off did not produce any proceeds] could be reached in a Section 363 sale of Collateral, for which both the Bankruptcy Court and [Appellees] concede that the consideration paid [to] the seller would constitute proceeds of Collateral." (D.I. 40 at 13).

Appellant's argument falls short. Here, the assets that constituted Collateral still provide value to the former lienholders. Unlike collateral sold in a Section 363 Sale, this Collateral remains within a reorganized version of TCEH. Because the TCEH First Lien Creditors now own common stock in Reorganized TCEH, they still benefit from the Collateral's economic value. The Collateral's value is therefore not exhausted. In a Section 363 sale, on the other hand, any consideration paid by a third-party buyer in exchange for collateral is proceeds of collateral. The former collateral, now held by the third-party buyer, no longer provides value to the seller's former lienholders. Thus, a Section 363 sale is distinguishable, and the Collateral's value is not exhausted here.

As Judge Drain held in *Momentive*, "a secured creditor is not getting the proceeds of its collateral when it gets stock in the reorganized entity, unless, of course, that stock was paid by a third-party buyer in return for the debtor's assets comprising the collateral." *Momentive*, 518 B.R. at 756. Just like the second lien creditors in *Momentive*, the TCEH First Lien Creditors received Plan Distributions in exchange for their liens as part of a debt-for-equity swap, as opposed to a third-party sale of the collateral. As such, the result should be the same as it was in *Momentive*, regardless of whether other lienholders maintained their liens.

For these reasons, the Stock Distribution is not "proceeds" of Collateral. *See In re Delco Oil, Inc.*, 365 B.R. 246, 250 (Bankr. M.D. Fla. 2007) ("The concept of 'proceeds' is implicated only when 'one asset is disposed of and another is acquired as its substitute.'").

## 2. Cash Distribution

Appellant argues that the Cash Distribution is "Collateral" or "proceeds." (D.I. 29 at 17-20). According to Appellant, the Cash Distribution includes "all remaining cash on TCEH's balance sheet, as well as all of the cash it had received from [Reorganized TCEH]." (D.I. 29 at 12). Thus, Appellant argues that *all* cash held by the TCEH Debtors, with the exception of "Segregated Cash," is Collateral or proceeds. This potentially includes cash held as of the date of the Cash Collateral Order, cash generated following the commencement of bankruptcy, and cash received from Reorganized TCEH. (D.I. 29 at 17-18).

### a. Cash Held as of the Date of the Cash Collateral Order

Appellant argues that all of the TCEH Debtors' cash held on the date of the Cash Collateral Order, with the exception of "Segregated Cash," constituted Collateral. (D.I. 29 at 17). Under the Cash Collateral Order, Collateral includes "substantially all of the TCEH Debtors' assets, including accounts receivable and cash to the extent that such cash constitutes proceeds of other Prepetition Collateral." (D.I. 30-2 at A69). "As of the date" of the Cash Collateral Order, Collateral included "all of the TCEH Debtors' cash, other than cash held in [a specified account]," known as "Segregated Cash." *Id.*

Appellees do not dispute that this portion of the TCEH Debtors' cash, if any, would be Collateral. However, Appellant does not argue that the Cash Distribution includes cash held as of the date of the Cash Collateral Order, or specify any portion of the Cash Distribution that constitutes cash held as of the date of the Cash Collateral Order. (D.I. 29 at 12).

22

### b. Cash Generated Following the Commencement of Bankruptcy and Cash Received From Reorganized TCEH

Appellant argues that "all cash generated from operation of the TCEH Debtors' business following the commencement of bankruptcy" also constitutes Collateral. (D.I. 29 at 17). As evidence, Appellant notes that the Cash Collateral Order "expressly provided that the Collateral Agent and First Lien Creditors would receive the benefit of Section 552(b) of the Bankruptcy Code, ensuring that the Collateral Agent's Lien attached to all cash generated" post-bankruptcy. (D.I. 29 at 17; D.I. 30-2 at A113).

Appellees respond with two primary arguments to demonstrate that this after-arising cash held by the TCEH Debtors is not Collateral or proceeds.

First, Appellees argue that Appellant waived its Section 552(b) argument by failing to raise it before the Bankruptcy Court. (D.I. 38 at 20-21, 33). Appellant responds that "[i]t is absurd to suggest that [Appellant] was required to refer the Bankruptcy Court to a specific provision in its own order to preserve the benefit provided by that provision, in litigation relating to the same bankruptcy case in which that order was entered," especially given that Appellant's complaint attached the Cash Collateral Order in its entirety. (D.I. 40 at 14).

I agree with Appellees that Appellant waived its Section 552(b) argument by failing to raise it before the Bankruptcy Court. In its brief in the Bankruptcy Court (D.I. 32-10 at A1087-89 ("Table of Authorities")), Appellant did not cite Section 552(b). It did not argue that the Cash Collateral Order "provided that the Collateral Agent and First Lien Creditors would receive the benefit of Section 552(b) of the Bankruptcy Code, ensuring that the Collateral Agent's Lien attached to all cash generated" post-bankruptcy. (D.I. 32-10). As a result, Appellant does not contend that it raised the Section 552(b) issue in the Bankruptcy Court by making such an argument. Rather, Appellant argues that it raised the issue by attaching the 59-page Cash

23

Collateral Order (D.I. 30-2 at A61-119) to its complaint. (D.I. 40 at 14). Appellant also argues

that it need not have "refer[red] the Bankruptcy Court to a specific provision in its own order,"

and thus could not have waived its Section 552(b) argument by failing to cite paragraph 21 of the

Cash Collateral Order. (D.I. 40 at 14). "It is axiomatic that arguments asserted for the first time

on appeal are deemed to be waived and consequently are not susceptible to review in this Court

absent exceptional circumstances." *Eid*, 740 F.3d at 125. Appellant did not "assert" its Section

552(b) argument to the Bankruptcy Court.[5] Appellant cannot argue that the Bankruptcy Court

committed error by failing to attach special significance to a specific provision in a 59-page

Order attached to Appellant's complaint absent any identification of the provision or argument

by Appellant.[6] No "exceptional circumstances" warrant my consideration of Appellant's

argument. Appellant had not one, but two opportunities to raise its Section 552(b) argument

before the Bankruptcy Court. Appellant could have raised the issue when the Bankruptcy Court

considered the Original Plan, and again when the Bankruptcy Court considered the New Plan.

(D.I. 32-10 at A1116; D.I. 41-5 at A3887). Appellant failed to do so on either occasion.

---

[5] Appellant never claimed the benefit of Section 552(b) at the Bankruptcy Court. Appellant did not cite Section 552(b). Appellant did not cite paragraph 21 of the Cash Collateral Order, which claims the benefit of Section 552(b). However, Appellant did cite paragraph F(i)(e) of the Cash Collateral Order to the Bankruptcy Court. (D.I. 32-10 at A1116). I have considered whether Appellant's paragraph F(i)(e) citation can substitute for Appellant's Section 552(b) argument. I do not believe that it can do so. Paragraph F(i)(e) defines "Collateral" as including "cash to the extent that such cash constitutes proceeds of other Prepetition Collateral." (D.I. 30-2 at A69). This language arguably contains similarities to the language of Section 552(b). However, Appellant did not explain how paragraph F(i)(e) provides the benefit that it now, on appeal, argues is provided by Section 552(b). Appellant did not note that "Collateral" includes "cash to the extent that such cash constitutes proceeds of other Prepetition Collateral." Rather, Appellant cited paragraph F(i)(e) for the proposition that "Cash on Hand constitutes First Lien Collateral." (D.I. 32-10 at A1116). Paragraph F(i)(e) does not provide that "Cash on Hand constitutes First Lien Collateral." Appellant did not explain how paragraph F(i)(e) supports the proposition that "Cash on Hand constitutes First Lien Collateral."

Appellant separately argued to the Bankruptcy Court that after-arising cash "must derive from" pre-Petition Collateral. (D.I. 41-5 at A3887). However, it cited no authority for its argument, and did not direct the Bankruptcy Court to Section 552(b) or paragraph (F)(i)(e).

[6] It does not matter that the Order was the Bankruptcy Court's "own" order. No court remembers every order it has signed, nor appreciates the significance of a paragraph buried in a lengthy order it signed over a year and a half earlier. *Cf.* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .") (applicable in adversary proceedings through Rule 7056 of the Federal Rules of Bankruptcy Procedure).

24

Accordingly, Appellant waived its argument. It cannot now seek the benefit of an argument it failed to raise below.

Having waived its Section 552(b) argument, Appellant has no argument that "all cash generated from operation of the TCEH Debtors' business following the commencement of bankruptcy" constitutes Collateral or proceeds.

Second, Appellees argue that even if Appellant has not waived its argument, Appellant fails to trace the Cash Distribution to pre-petition Collateral. (D.I. 38 at 21). Section 552(a) prohibits pre-petition liens from attaching to property acquired by the debtor after the commencement of bankruptcy proceedings. 11 U.S.C. § 552(a). Section 552(b) serves as an exception to this rule, providing that pre-petition liens can attach to "proceeds, products, offspring or profits" of "property the debtor acquired before the commencement of the case" to the extent provided by a pre-petition security agreement. 11 U.S.C. § 552(b).

Section 552(b) requires Appellant to trace the cash generated from the operation of the TCEH Debtors' business following the commencement of bankruptcy to pre-petition Collateral or proceeds thereof. *See, e.g., In re Sherwood Ford, Inc.*, 125 B.R. 957, 962 (Bankr. D. Md. 1991) ("The secured party bears the burden of proving that its pre-petition lien retained its vitality as a postpetition lien on property acquired by a debtor after the filing of bankruptcy") (citing 4 *Collier on Bankruptcy*, ¶ 552.01 at 552-5, 6 (15th ed. 1990)). Otherwise, that cash cannot itself be considered Collateral.

However, Appellant makes no effort to trace the cash generated from the operation of the TCEH Debtors' business following the commencement of bankruptcy to pre-petition Collateral or proceeds thereof. Appellant does not argue that cash generated from the operation of the TCEH Debtors' business following the commencement of bankruptcy is "proceeds, products,

offspring or profits" of pre-petition Collateral. Rather, Appellant argues that "substantially all of the TCEH Debtors' assets" were Collateral at the time of the Cash Collateral Order. (D.I. 29 at 17). However, just because pre-petition Collateral included "substantially all" of the TCEH Debtors' assets does not necessarily mean that cash generated from the operation of the TCEH Debtors' business following the commencement of bankruptcy is "proceeds, products, offspring or profits" of that pre-petition Collateral.

The Cash Distribution also includes "cash received from Reorganized TCEH." (D.I. 38 at 21). This "presumably" refers to the proceeds of the Preferred Stock Sale. (*Id.*). This "cash received from Reorganized TCEH" is not "proceeds of Collateral" because there was no sale of Collateral. *Supra* III.B.1.a. Appellant has not shown that this cash is traceable to pre-petition Collateral.

Accordingly, Appellant has not shown that cash generated following the commencement of bankruptcy or cash received from Reorganized TCEH is Collateral or proceeds. As noted above, Appellant does not argue that the Cash Distribution includes cash held as of the date of the Cash Collateral Order.

Appellant has therefore not shown that any part of the Cash Distribution is Collateral or its proceeds.[7,8]

---

[7] The definition of Collateral in the Cash Collateral Order carves out an exception for Segregated Cash. (D.I. 30-2 at A69). In its reply brief, Appellant notes that ¶ 10 of the Cash Collateral Order requires the TCEH Debtors to "not make any payments" from the Segregated Cash account. (D.I. 40 at 14) (citing D.I. 30-2 at A100). Appellant argues that the Cash Distribution is entirely traceable to Collateral, since no payments were to be made from the Segregated Cash account. (*Id.*). I agree with Appellant that the Cash Distribution does not include the Segregated Cash stipulated not to be Collateral in the Cash Collateral Order. However, I disagree that Appellant has shown the Cash Distribution is at all traceable to Collateral.

[8] Plaintiff stated that its motion in the Bankruptcy Court "present[ed] pure questions of contract interpretation, and there [were] no material issues of fact to be resolved." (Bankruptcy Adv. No. 15-51239-CSS, D.I. 62 at 2). Accordingly, there are no grounds for me to decide that there is a dispute of material fact as to whether Appellant has shown that the Cash Distribution is Collateral or proceeds.

26

### 3. TRA Rights

The TRA Rights are also not Collateral or proceeds. Appellant argues that the TRA rights, which are rights to receive future payments from Reorganized TCEH arising out of the tax attributes of the step-up in basis, are the "proceeds" of those tax attributes. (D.I. 29 at 18-19). Appellant argues those tax attributes are "general intangibles to which the Collateral Agent's liens attached as Collateral under the Security Documents." (D.I. 29 at 19) (citing D.I. 36-2 at A3356). But the Security Documents define "General Intangibles" as rights under "contracts, agreements, instruments, and indentures." (D.I. 36-2 at A3351). The definition of "General Intangibles" does not include tax attributes. Furthermore, the tax attributes derive not from the assets that constitute Collateral, but rather from a feature of the Tax Receivable Agreement belonging to Reorganized TCEH. (Orig. Op. at A1156). Thus, any benefits derived from the tax attributes are not "proceeds of Collateral." (*Id.*).

### 4. Adequate Protection Payments

Likewise, Adequate Protection Payments are not Collateral or proceeds. Appellant's argument that the Payments are indeed Collateral or proceeds hinges on the failed argument Appellant makes for the Cash Distribution: "all cash is Collateral." (D.I. 29 at 19). Furthermore, as the Bankruptcy Court noted, adequate protection is designed "to protect secured creditors against diminution in value of their collateral." (Orig. Op. at A1158; *see also* New Op. at A2186). It therefore makes sense that Adequate Protection Payments would not themselves be Collateral.

Because none of the Stock Distribution, Cash Distribution, TRA Rights, or Adequate Protection Payments constitute Collateral or proceeds, the first condition precedent to the application of the Section 4.1 Waterfall is not satisfied. This alone renders the Section 4.1 Waterfall inapplicable.

27

## C. "Collateral or the proceeds of Collateral must have resulted from a sale or other disposition of, or collection on, such Collateral"

The third condition precedent to the application of the Section 4.1 Waterfall is that "the Collateral or the proceeds of Collateral must have resulted from a sale or other disposition of, or collection on, such Collateral." Likewise, it is not satisfied.

A "sale or other disposition of" Collateral did not occur. *Supra* III.B.1.a. Thus, the Stock Distribution, Cash Distribution, TRA Rights, and Adequate Protection Payments could not have resulted from a "sale or other disposition of" Collateral.

The Stock Distribution, Cash Distribution, TRA Rights, and Adequate Protection Payments did not result from a "collection on . . . Collateral," either. Appellant argues that "fil[ing] a proof of claim . . . is using a traditional method of collecting a debt." (D.I. 29 at 30) (citing *Gardner v. State of New Jersey*, 329 U.S. 565, 573 (1947)). The Collateral Agent filed a proof of claim. (D.I. 32-18 at A1363). However, collecting on a debt is distinct from collecting on Collateral.[9] Collecting on Collateral amounts to collecting on a debt, but collecting on a debt does not necessarily amount to collecting on Collateral. 2 Collier on Bankruptcy P 101.12 (16th ed. 2018) ("The term 'debt' means liability on a claim"); New York U.C.C. § 9-102(a)(12) ("Collateral means the property subject to a security interest"). Appellant provides support only for its argument that filing a proof of claim amounts to "collecting a debt." Appellant therefore does not sufficiently allege that there was a "collection on . . . Collateral." As a result, Appellant's argument is unpersuasive.

---

[9] In their brief, Appellees assert that Appellant's argument that the Plan Distributions are a "collection on" Collateral is "simply wrong" because "collecting on a debt and collecting on collateral are distinct, as the Bankruptcy Court recognized." (D.I. 38 at 26). Appellant does not respond to this argument, or any argument about a "collection on" Collateral, in its reply brief. (D.I. 40).

28

Because the third condition precedent to the application of the Section 4.1 Waterfall is
not satisfied, the Section 4.1 Waterfall does not apply to the distribution of any of the Plan
Distributions or the Adequate Protection Payments. Accordingly, I need not address the second
and fourth conditions precedent, or whether post-petition interest was "due and payable" such
that it must be included in calculating amounts to be distributed under the third paragraph of
Section 4.1 of the Intercreditor Agreement.

## IV.   CONCLUSION

For the reasons set forth herein, the Bankruptcy Court's April 27, 2017 Order denying
Appellant's motion to partially vacate judgment is **AFFIRMED**.

An appropriate order will be entered.